STATE OF INDIANA, EX REL. LICKING TOWNSHIP v. CLAMME ET AL.

[No. 11,168.  Filed March 10, 1922.  Rehearing denied June 30, 1922.  Transfer denied June 8, 1923.]

1. STATES.—*Department of Inspection and Supervision.—Board of Accounts.—Relation.—Statutes.*—Under Acts 1909 p. 136 (§7564a et seq. Burns 1914), as amended by Acts 1915 p. 138 (§7546a Burns' Supp. 1921), the department of inspection and supervision of public offices, consisting of the state examiner and his deputies and employes, and the state board of accounts, consisting of the Governor, the auditor of state and the state examiner, are separate and distinct bodies, and both are distinct from the board of certified accountants, created by Acts 1921 p. 455 (§745612 et seq. Burns' Supp. 1921). p. 157.

2. STATES.—*Examination of Accounts of Public Officers.—Authority of Examiners.—Statutes.*—The purpose of Acts 1909 p. 136 (§7546a et seq. Burns 1914), as amended by Acts 1915 p. 138 (§7546a Burns' Supp. 1921), requiring an annual examination of the accounts of every officer who receives and disburses public funds, is to determine whether the accounts of such officers are accurate, but neither the chief examiner nor any of his deputies can allow or disallow any item of expenditure. p. 162.

3. OFFICERS.—*Reports of Department of Inspection and Supervision of Public Offices.—Transmission to Attorney-General.—Discretion of Attorney-General.—Statutes.*—Under Acts 1909 p. 136 (§7546a et seq. Burns 1914), providing that the attorney-general, on receiving a report from the department of inspection and supervision of public offices that an officer has misappropriated funds, to institute such civil proceedings against the delinquent officer as will secure to the state or to the proper municipality the recovery of the funds misappropriated, it is the duty of the attorney-general to exercise a sound discretion as to whether to institute a suit on the report. p. 163.

4. OFFICERS.—*Misappropriation of Public Funds.—Report of Department of Inspection.—Suit by Attorney-General.—Parties Defendant.—Statutes.*—Under Acts 1909 p. 136 (§7546a et seq. Burns 1914), authorizing the attorney-general, on receiving a report from the department of inspection and supervision of public offices that an officer has been guilty of the misappropriation of funds, to sue the officer and join with him "any other proper person" to recover the funds misappropriated, the only action which the attorney-general may .institute is one against a delinquent public officer and against such other per-

sons as may be properly joined with him; the word "proper" being one of limitation. p. 164.

5. STATES.—*Department of Inspection and Supervision of Public Offices.—State Board of Accounts.—Powers.*—Both the department of inspection and supervision of public offices and the state board of accounts are administrative bodies, and neither have any powers, except that which is expressly granted, and such further power as may be granted by necessary implication. p. 164.

6. STATES.—*State Board of Accounts.—Powers and Duties.— Implied Authority.*—The powers and duties of the state board of accounts are so clearly defined by the express provisions of the statute (§7546a et seq. Burns 1914, Acts 1909 p. 136) as to exclude any implication of other power. p. 164.

7. STATES.—*Department of Inspection and Supervision of Public Officers.—Powers.—Control of Public Officers.—Statutes.*— Under Acts 1909 p. 136 (§7546a et seq. Burns 1914), as amended by Acts 1915 p. 138 (§7546a Burns' Supp. 1921), creating the department of inspection and supervision of public offices, the duties of the department are limited to the subject of accounting and reporting, and it has no authority to control the discretion of any public officer, administrative board, or other governmental agency. p. 165.

8. HIGHWAYS.—*Inspection.—Powers of Department of Inspection and State Board of Accounts.*—Neither the state board of accounts nor the department of inspection and supervision of public offices, nor the two agencies jointly, have authority to inspect a highway to ascertain whether it conforms to the contract requirement; nor has either body any authority to employ a surveyor or an engineer for that purpose. p. 166.

9. STATES.— *Misappropriation of Public Funds of County or Municipality.—Right of State to Sue for Recovery.*—The state has no power to sue for the recovery of county or municipal funds which have been misapplied or misappropriated. p. 167.

10. TOWNS.—*Township as Taxing District.—Right to Sue.*—A township, as a taxing district for the improvement of a highway, is not a legal entity, but merely a geographical area, and it can neither sue nor be sued. p. 168.

From Blackford Circuit Court; *Frank Gordon,* Judge.

Action by the State of Indiana, on the relation of Licking township, as a taxing district, against Perry W. Clamme and others. From a judgment for defendants, the relator appeals. *Affirmed.*

*U. S. Lesh,* Attorney-General, *James W. Noel, Dale F. Stansbury* and *A. G. Emshwiller,* for appellant.

*Simmons & Simmons,* for appellees.

Statement by Dausman, C. J.—This action was instituted by the attorney-general in the name of the State of Indiana, on the relation of Licking township, *as a taxing district,* in Blackford county, against Perry W. Clamme and his bondsmen. A demurrer was sustained to the amended complaint which consisted of three paragraphs; the appellant refused to plead further and judgment was rendered for the appellees accordingly.

Insofar as necessary to an understanding of the question presented by this appeal, the facts averred in the first paragraph of the amended complaint are as follows:

"On June 4, 1917, the board of commissioners entered into a written contract with the defendant Perry W. Clamme. By the terms of the contract the defendant (hereinafter designated contractor) agreed to construct a macadam road in Licking township, which road was established on the petition of Samuel A. Harden et al. and is known as Cherry street Free Macadam Road. The contractor agreed to construct the road in accordance with the profile, plans, specifications, and report, which had been duly approved and adopted by the board. The contractor further agreed that in the construction of the road he would furnish all materials, labor, tools, implements, teams, and everything necessary for the construction of the road. In consideration for the construction of the road the contractor was to receive the sum of $29,532 to be paid in accordance with the terms of the contract. The contractor filed with the auditor of the county a bond in which it was provided that if he should be awarded the contract for the construction of the road, he would promptly enter into a contract

with the board for the construction of the road and would well and faithfully perform the contract in all respects, the construction bond to be in the sum of $63,-000. The construction bond was executed accordingly, with the four other defendants as sureties therein, and was duly accepted and approved by the board. A copy of each of the following named documents was filed with and made a part of the amended complaint: the contract; the report of the viewers and engineer, containing the specifications, the plans and profile; and the construction bond. The contractor entered upon the work, and, as the work progressed, one Fred Glancy, the engineer appointed for the work, made partial estimates of amounts due the contractor. Warrants were issued for the amounts named in the estimates and were paid to the contractor. On December 3, 1917, the engineer made a final estimate showing the amount due the contractor, and filed the estimate with the board. The final estimate was allowed by the board, and thereupon the auditor issued a warrant thereon which was paid to the contractor. The total amount of said warrants equalled the full contract price for the construction of the road.

"The proceedings for the construction of the road were pursuant to the provisions of 'an act concerning highways,' approved March 8, 1905, and pursuant to all acts amendatory thereof and supplemental thereto. Licking township was the taxing district for the purpose of providing funds with which to pay for the road. Bonds to the amount of $35,000 were sold for that purpose and the taxing district has paid part of the bonds and is liable for the payment of the balance.

"The contractor did not faithfully perform the contract, in this: the contract provided that there should be used eighty-six feet of thirty-six-inch cast iron culvert pipe, but the contractor used only 62½ feet of that

kind of pipe and substituted for the balance concrete culvert pipe. He did not excavate all the dirt required to be excavated, but left 1,235 cubic yards unexcavated; and the reasonable cost of excavating the balance is $494. He did not use 205 tons of Stanolind Paving Asphalt required by the contract, but used only 166.8 tons thereof, leaving a balance of 38.2 unused; and the value of the unused asphalt was $702.88. The contract required that the asphalt should be applied at a temperature of not less than 300° Fahrenheit, and that immediately after the application thereof the surface should be covered with dry limestone screenings after which it should be rolled; but he failed to do the rolling immediately, and in some instances delayed from one to five days, and the delay resulted in rendering the asphalt valueless as a binder.

(The injurious effects resulting from the contractor's failure to comply with the contract are set out at length, and it is averred that the total damage suffered by the relator is $7,393.33.)

"The board of commissioners in allowing the various estimates acted through mistake; the sworn statements of the engineer, as to the completion of the road, were made by mistake; and the board acted on the sworn statements, believing them to be true when they were not, thereby accepting and receiving the road by mistake.

"By authority of the 'State Examiner of the State Board of Accounts' one Fosdick and one Major, 'field examiners of said department, and Abraham L. Donaldson, civil engineer of said department,' an examination was made of the road; and a report of the examination was made, signed and verified in quadruplicate by said 'field examiners and civil engineer.' The report was filed with the state examiner, and after inspection by him, one copy was filed with the contractor, one copy

with Blackford county, and one copy delivered to the Governor, who transmitted his copy to the attorney-general; and thereupon the attorney-general has instituted this action against the contractor and his bondsmen, to secure to the taxing district the damages suffered by it from the failure of the contractor to construct the road according to the contract.

"The plaintiff asks that the settlement made between the contractor and the board of commissioners be set aside; for judgment in the sum of $8,000; and for all other proper relief."

The second paragraph of the amended complaint is on the ground that the acceptance of the road was procured by fraud. In other respects it is like the first. The substance of the averments relating to the fraud is as follows:

"That one Fred Glancy, engineer, and one J. B. McEldowney, superintendent of construction, did not give proper attention to their duties, but relied on the contractor; that the contractor falsely represented to them that the road had been completed according to the contract; that by his representations he procured them to execute and file certificates of completion; that he fraudulently represented to the board that the road had been completed according to the contract; that the engineer and superintendent executed the certificates of completion in reliance upon the fraudulent representations of the contractor, and that the board accepted the road relying upon his fraudulent representations; that the contractor fraudulently concealed the facts; that the defects did not become apparent for some time after the road was accepted; and that when the defects became apparent it was too late for the relator or any taxpayer to file objections with the board or to appeal from the order of the board."

The third paragraph does not differ materially from the second.

With commendable fairness and official propriety the attorney-general concedes that this action cannot be maintained unless authority to institute and maintain it is conferred by the statutes relating to the powers and duties of the administrative body commonly called "The State Board of Accounts." The attorney-general further concedes that if "The State Board of Accounts" had no power to inspect the highway, then the action of that body conferred on him no authority to institute the action; and in that event the demurrer was rightfully sustained.

The state board of accounts was created by an act entitled: "An Act concerning public accounting and reporting and supervision thereof, and providing penalties for the violation of this act." Acts 1909 p. 136, §7546a *et seq.* Burns 1914. The first section of that act was amended in 1915 to provide that the chief examiner may be removed only after a hearing on charges preferred. Acts 1915 p. 138, §7546a Burns' Supp. 1921.

In the year 1911 the legislature enacted another statute entitled: "An Act concerning the collection and recovery of public funds of the State of Indiana and of counties, townships, cities and towns therein, and other matters properly connected therewith." This act consisted of fourteen sections, and related exclusively to proceedings to be instituted and conducted by the attorney-general and prosecuting attorneys for the recovery of public funds from delinquent public officers, except as to the following particulars: §1 related to the appointment of field examiners and their compensation; §13 repealed all conflicting laws, and §14 declared an emergency. Acts 1911 p. 195, §7546x Burns 1914.

In the year 1913 the legislature amended §7 of the

act of 1911, Acts 1913 p. 689. That section, originally and as amended, related only to the fees to be allowed prosecuting attorneys for recovering public funds by suit or compromise.

In the year 1915 the legislature passed an act entitled: "An Act providing for a state board of certified accountants, defining their powers and duties, and providing for the examination and licensing of certified accountants." That act declares: "That the state examiner and the two deputy examiners of the state board of inspection and supervision of public offices shall constitute, ex-officio, a state board of certified accountants. They may at any time they deem it necessary, call in consultation an advisory board of three persons, each of whom shall be a person schooled in the knowledge and practice of accounting and actively engaged as a professional public accountant within this state." That board is directed by this statute to hold annual examinations for the purpose of determining the competency of any person who may apply for a license to practice as a certified public accountant. Each applicant shall be examined in the theory of accounts, practical accounting, auditing and commercial law as affecting accountancy. Acts 1915 p. 552, §7546q1 Burns' Supp. 1918.

In the year 1917 the legislature enacted a statute entitled: "An Act concerning the examination of public accounts and reports thereon, the collection and recovery of public funds, prescribing the duties of public officers in relation thereto, repealing all laws in conflict therewith, * * *" This act expressly repeals all of the act of 1911, Acts 1911 p. 195, *supra,* excepting the amended first section thereof, and except the repealing and the emergency section thereof; and also expressly repealed §7 of the act of 1911 as amended. Acts 1917 p. 347, §7546j *et seq.* Burns' Supp. 1921.

In the year 1919 the legislature provided: "That field examiners appointed by the state examiner of the department of inspection and supervision of public offices shall be paid the sum. of Ten Dollars per day * * *" Acts 1919 p. 813, §7546z1 Burns' Supp. 1921. At the same session the legislature provided that certain expenditures by public officers shall be legalized upon the approval of the "state board of accounts." Acts 1919 p. 117.

In the year 1921 the legislature authorized "the governor, the state auditor and the state examiner, constituting the state board of accounts" to collect certain data relating to fees and salaries. Acts 1921 p. 890.

In the year 1921 the legislature imposed certain duties on the state examiner of the state board of accounts relating to the preparation of the budget. Acts 1921 p. 375, §7546a2 *et seq.* Burns' Supp. 1921.

In the year 1921 the legislature created anew a state board of certified accountants. Section 1 of that act provides that: "The state examiner and two deputy examiners of the department of inspection and supervision of public offices shall constitute ex-officio the state board of certified accountants of Indiana." The act also provides that: "The state board of certified accountants of Indiana shall have its offices with the department of inspection and supervision of public offices in the state house." The act expressly repeals the act of 1915 (Acts 1915 p. 552, *supra*) on the same subject. Acts 1921 p. 455, §7546l2 *et seq.* Burns' Supp. 1921.

In the year 1920 the legislature enacted a statute "creating a special coal and food commission consisting of the members of the state board of accounts." That act authorizes an "investigation of the high cost of food products, profiteering, hoarding and destroying of food products by wholesalers, retail dealers or individuals

engaged in the sale or distribution of food products."
It also authorizes the appointment of "such engineers,
accountants, clerks, assistants and employes as in the
judgment of said commission shall be .necessary or
proper in the performance of its duties." Acts 1920
p. 143, §10052g5 *et seq.* Burns' Supp. 1921.

DAUSMAN, C. J.—From the foregoing abstract of the
legislation relating, immediately or remotely, to the
question involved in this appeal, it is apparent that the
powers of the state board of accounts, and the powers
of the department of inspection and supervision of pub-
lic offices, and the duty and authority of the attorney-
general, as dependent upon the aforesaid governmental
agencies, must be determined from the act of 1909 as
amended, Acts 1909 p. 136, *supra,* and from the act of
1917, Acts 1917 p. 347, *supra.*

The first and last sentences of §1 of the act of 1909
are rather striking. The first sentence is: "Be it en-
acted by the general assembly of the state of Indiana,
that there is hereby created and established a depart-
ment of inspection and supervision of public offices."
The last sentence is: "The department of inspection
and supervision of public offices shall be provided with
suitable quarters in the state house." Both sentences
have been retained in the amended section. This act
provides that the "principal officer of said department
shall be known as state examiner"; that the governor
shall appoint the state examiner and two deputy ex-
aminers; that each of these three persons shall be a
skillful accountant and well versed in public accounting;
and that the state examiner shall appoint a "clerk of
said department." The act further provides that "The
governor, the auditor of state and state examiner shall
constitute the state board of accounts."

It is important to note that by the act of 1919, Acts

1909 p. 136, *supra,* as amended, two governmental agencies have been created, viz.: (1) the Department of Inspection and Supervision of Public offices; and (2) the State Board of Accounts. The state examiner and his deputies constitute the former; and the Governor, the auditor of state, and the state examiner constitute the latter. On first impression one may be inclined to regard the two names as referring to the same body; but the fact that throughout all the legislation relating to these bodies the legislature has been careful to maintain the distinction, effectually dispels all doubt as to this feature. It is important, also, to note that by the act of 1915, Acts 1915 p. 552, *supra,* the legislature created a state board of certified accountants; and that by the act of 1921, Acts 1921 p. 455, *supra,* the last-named board was created anew. We have, then, three separate and distinct legal entities whose duties relate to the one general subject of accounting and reporting.

By the act of 1909, Acts 1909 p. 136, *supra,* the state board of accounts is expressly empowered and directed to formulate, prescribe and install a system of accounting and reporting, which shall be uniform for every public office of the same class and shall conform to the provisions of that act; to formulate all statements and reports which may be required to be made or published; to make and enforce from time to time such changes in the system and forms of accounting and reporting as it may deem wise or as may be required by law; to employ clerical assistants and expert assistants for the purpose of that work, and fix their compensation; to fix the maximum number of field examiners; and to adopt rules and regulations for conducting examinations of field examiners.

By the act of 1909, Acts 1909 p. 136, *supra,* the de-

partment of inspection and supervision of public offices is expressly empowered and directed to discharge the following duties:

The state examiner shall require from every municipality and every public institution annual financial reports; shall arrange the substance of the annual reports for publication as a statistical document; shall submit the statistical document to the Governor annually and to the legislature at each regular session; and shall furnish to the officers blanks for that puruse, together with printed instructions for filling the blanks; and shall appoint assistants to be known as field examiners.

The chief examiner and deputy examiners shall conduct examinations to determine the fitness of persons to serve as field examiners. The state examiner, personally or through the deputy examiners and field examiners, shall make an examination, at least once each year, of the accounts and financial affairs of every public office, officer and institution. On every such examination inquiry shall be made as to the financial condition and resources of each municipality or institution; as to whether the laws of the state and the requirements of the department of inspection and supervision of public offices have been complied with; and as to the methods and accuracy of the accounts and reports of the office examined. When making the examination the state examiner, deputy examiners, or field examiners shall have the right to enter into any public office or public institution to examine the books, papers or documents contained therein or belonging thereto, for the purpose of the examination; shall have access, in the presence of the custodian thereof or his deputy, to the cash drawers and the cash in the custody of the officer; shall have the right, during business hours, to examine the public accounts in any depository

having public funds in its custody pursuant to law; shall have the right to issue subpoenas for witnesses to appear in person or to produce books and papers for inspection; and shall have authority to administer oaths and to examine witnesses touching the matters under examination.

The officer making the examination shall make, sign and verify a report thereof in duplicate; and one copy shall be filed with the state examiner, and the other copy shall be filed with the officer or municipality examined. If any examination discloses malfeasance, misfeasance or nonfeasance on the part of any officer, an additional copy of the report shall be delivered to the Governor by the state examiner. Thereupon the Governor shall transmit the report to the attorney-general, and the attorney-general shall institute such civil proceedings against the delinquent officer, or upon his official bond, or both, as will carry into effect the findings resulting from the examination and secure to the proper municipality the recovery of any funds misappropriated.

The act now under consideration provides that the term "public office" shall mean and include the office of any person who holds, receives, disburses or keeps the accounts of receipts and expenditures of public funds; and that the term "public officer" shall mean and include any person who holds, receives and disburses public funds. The remainder of the act relates mainly to the books, records and forms to be used in the system of uniform bookkeeping, accounting and reporting. It provides that such books, records and stationery shall be purchased by the state; that no examination shall extend back more than one year prior to the beginning of the fiscal year, except on authority of the Governor; that it shall be the duty of public officers to adopt and use the books, forms. records, and systems of account-

ing and reporting which shall have been adopted by "the state board of accounts"; that nothing in the act shall relieve any officer of the duties imposed on him by law in relation to the auditing of public accounts or the disbursement of public funds; and that the act shall be supplemental to all existing laws for safeguarding the care and disbursement of public funds.

The act of 1917, Acts 1917 p. 347, *supra,* insofar as it relates to the duties of the department of inspection and supervision of public offices, provides that whenever an examination shall have been made, a report thereof shall be signed and verified in quadruplicate by the officer·making the examination; that the quadruplicate report shall be filed with the state examiner; that the state examiner, after inspecting the report, shall file one copy with the officer or institution examined, and one copy with the "auditing department" of the state; that if any examination discloses malfeasance, misfeasance or nonfeasance in office by any officer, a copy of the report shall be delivered by the state examiner to the Governor; that the Governor shall transmit his copy to the attorney-general; that in case the report shall disclose the commission of crime, it shall be the duty of the state examiner to cause the report to be presented to the proper grand jury and furnish the grand jury all evidence at his command for use in the investigation and prosecution of any criminal proceeding which may result; and that the state examiner and his subordinates shall use diligence in making investigations and in furnishing evidence in connection with actions based on the reports, when so requested by the attorney-general.

Insofar as it relates to the duties of the attorney-general, the act provides: The attorney general, upon receiving a copy of the report, shall diligently institute such civil proceedings against the delinquent officer; or

State, ex rel. *v*. Clamme—80 Ind. App. 147.

upon his official bond, or both, and against any other proper person, as will carry into effect the findings disclosed by the examination, and as will secure to the state or to the proper municipality the recovery of any funds misappropriated, diverted or unaccounted for. In all cases where any money comes into his hands he shall immediately pay the same into the treasury of the state or of the municipality to which it belongs, and shall cause the same to be distributed among the proper funds. By and with the consent of the department of inspection and supervision of public offices, he shall have power to compromise and adjust any action instituted by him under this act. Any action instituted by the attorney-general under this act may be in the name of the State of Indiana, or in the name of a municipality, or in the name of a "subdivision of the state," according to whichever of these governmental units may be entitled to recover money or to secure the relief sought; that if the action be brought on an official bond, it may be brought in the name of the state on the relation of the plaintiff; and that in any action brought under the act the plaintiff shall recover, in addition to the amount misappropriated, diverted, or unaccounted for, all penalties and interest as may be recoverable under other laws.

Under our system of government nearly all public officers are elected by the voters. Many of the officials thus chosen are charged with the duty of receiving and disbursing the public funds. It appears inferentially that the legislature became aware of the fact that the voters sometimes elect to offices of that class men who are unskilled in the art of bookkeeping and therefore incompetent and inefficient, or who are faithless and dishonest. To remedy as far as possible the evils that naturally result from that condition, the legislation here

involved was enacted. The specific purposes sought to be accomplished are a higher standard of accuracy and efficiency in accounting and reporting; the discovery of wrongdoing on the part of any officer of this class, with respect to the funds with which he is entrusted; and the recovery of that portion of the funds, if any, for the repayment of which the officer is liable by reason of his failure faithfully to discharge the duties of his trust as prescribed by law.

The purpose of requiring an annual examination of the accounts of every officer who receives and disburses public funds, is primarily to determine whether 2. or not his accounts speak the truth. To that end the examiner may compare the entry of receipts with the source from which they were derived; may compare the entries of disbursements with the vouchers and the records of allowances; may examine witnesses concerning the truth or falsity of any entry and of any voucher; and may count the cash on hand—all for the purpose of ascertaining the true state of the accounts and of the funds involved. Neither the chief examiner nor any of his deputies can allow or disallow, approve or disapprove, any item of expenditure, or adjudicate any question of fact or law; for the simple reason that neither the "department" nor any of its members has any judicial power whatsoever. For the same reason, neither the "department" nor any of its officers has any right to review the action of a board of commissioners, of a common council of a city, or of any board, court or officer, authorized by law to make allowances, for the purpose of altering, reversing or affirming any allowance made by any of those agencies. The report of every examination should show the facts exactly as they existed at the time of the examination.

Now, what is to be done when a legitimate report has been filed with the department of inspection and super-

vision of public offices? The chief examiner is
3.  directed to determine to his own satisfaction
whether or not the report shows any delinquency
on the part of the officer examined. If in the opinion
of the chief examiner that inquiry should be answered
in the affirmative, it then becomes his duty to transmit
a copy of the report to the Governor. The statute im-
poses the duty upon the Governor to deliver the report
to the attorney-general. Having received the report,
it then becomes the duty of the attorney-general to de-
termine for himself what the report discloses with ref-
erence to liability on the part of the officer to whom
the report relates. There can be no doubt that it is
the duty of the attorney-general to exercise a sound
discretion in the matter of instituting actions under the
statute. The plain language of the statute is that he shall
institute "such civil proceedings against such delinquent
officer   *   *   *   as will secure to the state or to the
proper municipality the recovery of any funds mis-
appropriated, diverted, or unaccounted for." This lan-
guage cannot be construed to mean that the legislature
intended arbitrarily to compel the attorney-general, con-
trary to his judgment as a lawyer and in violation
of the principle of local self-government, to involve
municipalities in fruitless litigation without their con-
sent. If the attorney-general concludes that the officer
is liable for the repayment of any of the public funds
which came into his hands, then it is his duty to insti-
tute the appropriate action to recover the "amount mis-
appropriated, diverted, or unaccounted for." The at-
torney-general is authorized to institute the action
against the officer alone, or against the officer and his
bondsmen; and is authorized also to join with the of-
ficer, or with the officer and his bondsmen, "any other
proper person."

As used in the foregoing quotation, the word "proper"

is a word of limitation. The attorney-general may join with the delinquent officer any other person who would be a proper party defendant under the rules of law. The only action which the attorney-general is authorized to institute under these statutes is an action against a delinquent public officer and such other persons as may be properly joined, to recover "the amount misappropriated, diverted, or unaccounted for," together with "such penalties and interest as might be recoverable under laws other than this act." In the case at bar the action is not against any public officer (or ex-officer), nor on an official bond. The fund created for the purpose of paying for the improvement of the highway is undoubtedly a public fund and the county treasurer is the custodian thereof. But this action was not instituted for the purpose of recovering that fund or any part thereof. There is no contention that the county treasurer has misappropriated, diverted, or failed to account for any part of that fund. The sole purpose of the action is to recover damages for the alleged failure to construct the road according to the contract; and for authority to institute the action, the attorney-general relied wholly upon the report of the inspection of the highway made by the department of inspection and supervision of public offices, and transmitted to him by the Governor. This brings us to the primary question which we are called upon to decide, viz.: Did the state board of accounts and the department of inspection and supervision of public offices, jointly or severally, have power to inspect the highway?

Each of the above-named governmental agencies is an administrative body and has no power except that which is expressly granted, plus whatever further power, if any, which is granted by necessary implication. The powers and duties of the state board of accounts are so clearly defined by the express

provisions of the statute that there is no occasion for a discussion of them. Those duties are of such à character that they may be discharged fully and completely without the aid of any implied power; and there is no intimation or suggestion in the statute that the legislature intended to grant that board any power whatsoever by implication.

The department of inspection and supervision of public offices was created for the purpose of examining the accounts of such public officers as handle public

7. funds. From the legislation relating to that department, it clearly appears that its powers and duties are limited to the subject of accounting and reporting. Incidentally, it is required to furnish such evidence as may have come to its knowledge in the course of an examination of the accounts of any public officer, for use in the prosecution of any person suspected of the commission of any crime involving the loss of public funds; and may consent to a compromise by the attorney-general of any action instituted by him in accordance with the legislation now under consideration.

There is absolutely nothing in any of the legislation relating to this subject which tends in the slightest degree to authorize the department to control the discretion of any public officer, administrative board, or other governmental agency whatsoever. Indeed, the legislature could not create a department and endow it with power to supervise and control public officers in the performance of their duties generally, without amending all the laws relating to the powers and duties of the officers of the state and of every administrative subdivision of the state. It is to be presumed that if the legislature were to attempt such a comprehensive and serious project, it would not be unmindful of constitutional provisions. Art. 4, §§19, 21 Constitution.

The powers expressly granted to the department are

amply sufficient to enable it to perform the duties imposed upon it; and there is in the statutes no evidence of an intent to grant any power by implication, unless an implied grant may be inferred from its official title. It must be conceded that the legislature selected a high-sounding name for its offspring. However, there is a conclusive and impelling reason why no grant of power may be inferred from the name. The people of Indiana, by their Constitution, vested the legislative power of the state in the general assembly, the executive power in the Governor, and the judicial power in the courts; and thereby, they have provided that the structure of their government shall consist of the three co-ordinate departments—the legislative, the executive, and the judicial. To concede that the legislature may create a department of inspection and supervision of public offices (officers), and endow it with power to supervise and control the three constitutional departments, would be to concede that the legislature has power to transform our state government from a republic to a despotism. Happily, such a transformation cannot be accomplished without first amending two constitutions. Art. 4, §4, U. S. Constitution; *Chicago, etc., R. Co.* v. *Railroad Com., etc.* (1906), 38 Ind. App. 439, 78 N. E. 338, 79 N. E. 520. There can be no doubt that the legislature intended that the department of inspection and supervision of public offices should be what is commonly called a "bureau"—a sub-department of the executive department.

Neither the state board of accounts nor the department of inspection and supervision of public offices had authority to inspect the highway, or to employ a surveyor or an engineer for that purpose; nor did the two agencies jointly have that authority. The action of the department in that regard constitutes a plain case of usurpation. There is nothing in the

statutes which can possibly be construed to authorize the department to inspect plans for a proposed improvement of a public highway, or for the construction of public bridges or buildings; or to inspect any public highway after it has been improved, or any public bridge or building after it has been constructed. Such inspections are wholly outside the scope of its authority.

The Supreme Court has said: "It is a well-settled doctrine that officers of the state exercise but delegated powers, and this is particularly true of the attorney-general. His office is created by statute, and he, as such officer, can only exercise such power as is delegated to him by statute." *Julian* v. *State* (1890), 122 Ind. 68, 23 N. E. 690; 1 Watson, Revision Work's Practice p. 126.

But the question here involved goes deeper than the authority of the attorney-general. Underlying the question of his authority is the question whether

9. or not the state has the right to institute and maintain the action. It has often been held that a taxpayer of a county or of a municipality has the right to sue for the recovery of public funds which have been diverted, misappropriated, or unlawfully expended, where the proper officers have refused so to do. *Miller* v. *Jackson Tp.* (1912), 178 Ind. 503, 99 N. E. 102; *State, ex rel.,* v. *Holt* (1904), 163 Ind. 198, 71 N. E. 653. See, also, §9595 Burns 1914, Acts 1913 p. 276. But the rule was well established that the state does not have the right to sue for the recovery of public funds which belong to a county or to a municipality, and to which funds the state has no title. *Zuelly* v. *Casper* (1903), 160 Ind. 455, 67 N. E. 103, 63 L. R. A. 133; *State, ex rel.,* v. *Casper* (1903), 160 Ind. 490, 67 N. E. 185; *State, ex rel.,* v. *Holt, supra; Eder* v. *Kreiter* (1907), 40 Ind. App. 542, 82 N. E. 552; 1 Watson, Revision Work's

Practice p. 107. There is no claim or pretense here that the action was instituted to recover funds belonging to the state. Therefore, if the action is maintainable to all, it must be by virtue of the statutes now under consideration.

As above stated, the statutes provide that whenever any money comes into the hands of the attorney-general, as a result of an action instituted under the act of 1917, Acts 1917 p. 347, *supra,* "he shall immediately pay the same into the treasury of the state or of the municipality to which it belongs, and shall cause the same to be distributed among·the proper funds." That provision supports and emphasizes the proposition that the legislature intended to authorize such an action only as seeks to recover against a delinquent public officer (and others who are jointly liable with him) on account of his liability for public funds for which he has failed to account according to law. When such an action results in a recovery, the amount so recovered, if more than one fund is involved, may be readily distributed to the various funds of the municipality to which it belongs by a reference to the tax levy or to any other source from which it was derived. Now, if an action had been instituted in the name of the state on behalf of Licking township, as a civil township, and had resulted in a recovery of a sum of money as *damages,* what should be done with the damages thus obtained? To what township fund would it belong? What township officer is authorized to receive it? Is it in any sense a township fund? We need not pursue this feature further; for the action was not instituted on behalf of Licking township as a civil township, as a school township, as a municipality, or as a corporation of any kind whatsoever. It was instituted on behalf of "Licking Township, as a taxing district." A mere taxing district is a geographical area, and nothing more.

To illustrate: In a street paving proceeding the taxing district is a strip of territory not exceeding 150 feet in width on either side of the improvement. That district has no governmental organization, no public officers, and is not a legal entity. It can neither sue nor be sued. The taxing district, which is the pretended relator herein, does not differ in this respect from the taxing district in a street paving proceeding; and it can have no standing as a litigant.

It may be that by virtue of the statutes here involved the attorney-general may institute an action in the name of the state on the relation of a municipality, on the bond of a public officer to recover for the sole benefit of the municipality funds unlawfully taken or expended, even though the state has no title to the funds, and regardless of whether the municipal officers have refused to do their duty. That question we do not decide.

There are other conclusive reasons why the demurrer was rightly sustained; but, in view of the theory on which the cause has been submitted to this court, we need not discuss them.

Judgment affirmed.